# WELLS *v.* ROPER.

EQUITY; INJUNCTION; POSTAL SERVICE; CONTRACTS.

Where a contract between an individual and the Postmaster General provided that the former should furnish certain automobiles of specified construction, with drivers, for a period of four years, for the delivery of mail matter in the city of Washington, to be paid for at a given price per annum, payable monthly; that any or all of the equipment provided for might be discontinued at any time upon ninety days' notice from the Postmaster General; and that all acts done by the First Assistant Postmaster General in respect of the contract should be deemed to be acts of the Postmaster General; and the First Assistant Postmaster General ordered a discontinuance of the use of the automobiles at the expiration of a ninety days' notice to the contractor, and notified the contractor of the cancelation of the contract as of that date, in order that an experimental combined screen wagon and city collection and delivery service might be conducted as provided for by the postal appropriation act of Congress of March 9, 1914, authorizing the Postmaster General to purchase and maintain wagons or automobiles in the operation of such an experimental service,—it was *held*, in a suit by the contractor against the First Assistant Postmaster General to enjoin the alleged threatened breach of the contract, that whether the action of the First Assistant Postmaster General had the effect of terminating the contract as matter of law, the suit was one, in effect, against the United States, and was therefore not maintainable, the plaintiff's remedy, if any, being by action in the Court of Claims.

No. 2820. Submitted October 15, 1915. Decided January 3, 1916.

HEARING on an appeal from a decree of the Supreme Court of the District of Columbia, dismissing a bill in equity for an injunction. *Affirmed.*

The COURT in the opinion stated the facts as follows:

The plaintiff, Josephus Wells, filed this bill against Daniel C. Roper as First Assistant Postmaster General of the United

States to obtain an injunction against a threatened breach of contract between plaintiff and the United States for certain postoffice equipments.

The bill alleges that about the 14th day of February, 1913, both parties entered upon the performance of their contract, according to its terms, and that plaintiff has at all times complied with every duty and obligation on his part to be performed upon said contract, and with every demand or requirement requested of him by the United States under such contract, and that the United States has at all times, as the same became due under said contract, fully paid the plaintiff according to its terms for the equipment and service rendered by the plaintiff; that plaintiff has never been guilty of any failures or delinquencies under said contract, and has never violated the Postal Laws or Postal Regulations; that it is not now, and never has been claimed or pretended by the United States of America, or by any person or officer whatsoever, that the plaintiff, or anyone in his behalf, has at any time or in any respect failed in the performance of any of his duties or obligations under said contract, or that he has been guilty of any delinquency in the performance of any obligation or stipulation of said contract; that equipments and service as specified in said contract are still necessary to and required by the Postoffice Department at Washington, and will be necessary to and required by the said Department up to and including the 14th day of February, 1917; that the plaintiff is ready, able, and willing and anxious to carry out and complete the said contract and every duty and obligation and stipulation thereto on his part to be performed according to its terms; that the defendant has no power, right, or authority, either as First Assistant Postmaster General, or in any other capacity, to cancel said contract or any part thereof. Yet the defendant has threatened to and will, unless restrained by the court, unlawfully, wilfully, and wrongfully interfere between the plaintiff and the United States of America in the carrying on and execution of said contract; in order, as he, the defendant, says "to conduct in Washington, District of Columbia, an experimental combined screen

wagon and city collection and delivery service." That in pursuance of his unlawful plan and purpose the defendant has, unlawfully and without any power or authority, undertaken to order that said contract be canceled. At the taking effect of the contract the plaintiff was required by the United States to purchase five new automobiles and their equipment for use under said contract, and he did at that time purchase five new automobiles at a cash cost to him of $9,250. The plaintiff was at the same time required, and he did, construct and equip a garage and repair shop in which to house, repair, and keep in first-class condition the said automobiles. The cash cost to plaintiff of constructing a building into a garage, with the necessary fire proofing and sewerage required by the regulations of the District of Columbia, was $2,535; the necessary cash cost to plaintiff for equipping the garage and machine shop, including electric wiring, electric motor, lathe, tools, etc., was $1,120; in addition to which and necessary to the performance of said contract by the plaintiff he has paid out in cash for fire insurance premiums, liability insurance premiums, bond to the government, for gasolene, lubricating oil, salaries, repainting, and revarnishing said automobiles, $12,799; the reasonable rental value for his garage building for the two years last past devoted to said contract is $1,200; the reasonable value for his own time and services for the two years last past devoted to the execution of said contract is $4,000.

In order to enable himself to acquire the equipment necessary for the execution of said contract, the plaintiff borrowed the sum of $11,000 in money; devoting all of it to that purpose, and has paid interest, in addition to the expenditures above named, at the rate of 6 per cent per annum on his said loan, a large amount of which is still owing and unpaid and will become due in February, 1915; his only means of payment must be derived from and through the contract with the United States aforesaid; he is a young man who has succeeded in establishing a small grocery store and grocery trade in which he has made a modest living for himself and his family. If this contract with the United States of America is interfered with by

the defendant, and he, the plaintiff, and the United States of America prevented from carrying it out, and he, the plaintiff, deprived of its advantages, or its performance even temporarily interfered with, he will be rendered insolvent, his credit will be destroyed, his business will be wholly broken up, and his prospects in life blasted.

The aforesaid building, which he constructed into and equipped as a garage, only for the purpose of executing said contract, is first class for that purpose, but utterly unfit for any other purpose; it is situated in the southeast section of Washington city, in a locality where there is no use for and no demand for automobile garages; and if plaintiff is deprived of said contract, said building will be useless and unrentable in its present condition, and will have to be again remodeled in order to be of any use or of any rental value. Each of the said automobiles is built according to the specifications set out in said contract; each is in first class condition for the completion of said contract, and worth substantially its original cost, but because of the peculiar construction and equipment required by the contract, they are of no practical value except for handling the mails and for the execution of said contract; and unless plaintiff is permitted to execute said contract said automobiles will be useless to him, and will be practically unsalable and of a trifling and insignificant market value, solely because equipped for said contract.

Defendant proposes to, or has threatened, and will, upon the 1st day of February, 1915, unless restrained and enjoined by the court, announce and promulgate publicly and throughout the Postoffice Department of the United States, that the said contract is annulled, and will, unless restrained and enjoined by the court, by the unlawful and wrongful exercise of his office as First Assistant Postmaster General of the United States, obstruct and prevent the plaintiff and the United States of America from the further execution of said contract on the part of either of the parties thereto, and will prevent the plaintiff from receiving his compensation under said contract, which now amounts to $1,034 per month, and the result of the said

abuse of the powers of his office by the defendant will be to deprive the plaintiff in the future of all the advantages and compensation of said contract.

If plaintiff and the United States of America are permitted to execute said contract according to its terms, the plaintiff will be able to repay to his creditors the money which, as above stated, he borrowed in order to pay for and acquire the automobiles and garage necessary for the execution of said contract. The said contract and the compensations thereunder have been and are the plaintiff's only resource for meeting the aforesaid obligations, and plaintiff has no adequate remedy at law.

Plaintiff prays an order restraining the defendant, his agents, and subordinates, from annulling or attempting to annul the said contract, and from interfering or attempting to interfere between the plaintiff and the United States of America in the proper and lawful execution of said contract by the plaintiff according to its terms, and that on final hearing said injunction may be made perpetual.

Attached as an exhibit to the bill is the contract entered into February 14, 1913, by and between the United States of America, party of the first part, and Josephus Wells, party of the second part.

This contract recites that the proposal of the party of the second part for furnishing to the said Department at Washington, in such numbers, and in such numbers at a time, and from time to time, according to such schedule as may be prescribed by the postmaster of Washington, District of Columbia, during the period beginning February 12, 1913, and ending February 11, 1917, the equipments and service hereinafter specified, was accepted by the Postmaster General, and contract therefor awarded to said party.

The covenants are that the party of the second part shall and will furnish and deliver at his sole risk and expense, in such numbers, and in such numbers at a time, as may be ordered by the postmaster at Washington, District of Columbia, in accordance with such schedule as he may prescribe, during the period beginning February 12, 1913, and ending February 11, 1917,

the following described equipments, at the prices specified, to wit:  Four automobiles with chauffeurs, and such additional number of automobiles with chauffeurs to be paid for *pro rata,* as may be required of the said party of the second part during the contract term, for use in the city delivery service of Washington, District of Columbia.  The contract proceeded to prescribe the capacity of the said automobiles, and their rate of speed, and the manner in which they shall be constructed, and provides that the United States shall pay at the rate of $3,-102.50 per annum for each equipment, payments to be made on the first day of each month.

The third provision of the contract is "that the said party of the second part hereby consents and agrees that any or all of the equipments contracted for herein may be discontinued at any time upon ninety days' notice from the said party of the first part."

The remainder of the contract makes provision for the keeping of the said equipment and its delivery as notified by the postmaster, and certain provisions for fines for delinquencies on the part of the party of the second part, and providing that for repeated failures or for violation of the Postal Regulations, the Postmaster General may, at his option, annul this contract and award a new contract for supplying such equipments during the remainder of the period contemplated by this contract. A further provision is that the annulment of this contract under any stipulation, reservation, or agreement herein contained, or any action taken by or on behalf of the United States in consequence or by reason of such annulment, shall not release or impair its obligation upon said party of the second part and the sureties upon his bond.

The eighteenth provision is that all acts done by the First Assistant Postmaster General in respect of this contract shall be deemed to be the acts of the Postmaster General, within the meaning and intent of this contract.

The contract is signed by F. H. Hitchcock, Postmaster General, and by the plaintiff.

Other exhibits show the bond given by the plaintiff for the

performance of the contract, and a letter of November 2, 1914, directed to plaintiff and signed by the defendant as First Assistant Postmaster General, which recites: "After careful consideration of the matter it has been determined that it is in the interest of the service to conduct in Washington, District of Columbia, an experimental combined screen wagon and city collection and delivery service under the provisions of the postal appropriation act approved March 9, 1914, authorizing the Postmaster General to purchase and maintain wagons or automobiles in the operation of such an experimental service. It is essential to the execution of this purpose that your contract for furnishing four automobiles for use in the delivery and collection service in Washington, District of Columbia, for the period from February 12, 1913, to February 11, 1917, be canceled, and you are hereby notified that under the third stipulation of the contract the use of all of the automobiles furnished thereunder will be discontinued at the close of business January 31, 1915, and the contract canceled effective on that date."

Plaintiff protested against this notice of cancelation, and, through his counsel, had correspondence with defendant.

Another letter attached as an exhibit, January 25, 1915, directed to counsel for plaintiff, and signed by Daniel C. Roper as First Assistant Postmaster General, recites the receipt of his letter relative to the cancelation of the contract, and, after conferring with the Postmaster General, in regard to the matter states: "I have to advise you that the Department does not see its way clear to take action other than that indicated in the letter of November 2, 1914, addressed to Mr. Wells, advising him that under the third stipulation of the contract the use of all of the automobiles furnished thereunder will be discontinued at the close of business January 31, 1915, and the contract canceled effective on that date."

Rule to show cause was issued and a temporary injunction awarded January 29, 1915.

The appropriation act of March 4, 1914, contained an appropriation for regulation screen or other wagon service, and provided that out of this appropriation the Postmaster General is

authorized, in his discretion, to use such amount thereof as may be necessary for the purchase and maintenance of wagons or automobiles for, and the operation of an experimental combined screen wagon and city collection and delivery service.

This is set up by an affidavit of the Postmaster General in opposition to the injunction, who further says that this experimental service comprehended the transportation of mail matter between the postoffice and its branches; the collection of mail matter from the street letter boxes, and postoffice stations; the delivery of letters, parcels, and mail matter of all other classes by means of government-owned automobiles operated by employees of the United States, instead of rented automobiles and horse-drawn vehicles capable of performing but one of said several classes of service at a time; that the object of said experimental service is to determine the policy and feasibility of installing such combined service throughout the United States wherever practicable; that at the time of the institution of this suit it had been officially considered and determined to inaugurate such experimental service at Washington; that pursuant to such determination all arrangements had been made to put such service into immediate operation; that it was intended that upon the result of such experimental service should depend the policy of the Postoffice Department in connection with the acceptance or rejection of contracts for service by private contractors throughout the large cities of the Middle West, wherein advertisements for postal and mail service are pending; that such experimental service was not established elsewhere, and has not been practicable at other points, and nine automobiles have been purchased for use in such service in Washington city; that by virtue of the temporary injunction the benefit of such experimental service has been interrupted and delayed for the past two months; that so far as pending contracts and advertisements and proposals are concerned, the benefits of such experimental service will be entirely lost if the injunction be reinstated or continued pending appeal; that the administration of the service will be greatly hampered, and the development of the policy of the Department will be delayed and interfered

with; that the resulting injury to the postal service comprehends more than the financial loss to the government in that it will interfere with the development of the policy of the entire postal service throughout the United States depending upon such experimental service, and entail great inconvenience to the Postoffice Department in the administration of such service, with consequent irreparable loss to the United States and the public, which cannot be compensated by a money recovery.

February 10, 1915, the defendant moved to dismiss on the ground that the defendant had no individual interest in the controversy, and that the relief sought against him is in his official capacity only, as a representative of the government, which alone is to be affected by any decree herein; wherefore the said suit, as manifest upon the face of the bill, is essentially and substantially a suit against the United States, beyond the jurisdiction of the court.

Second, it is manifest, upon the face of the bill of complaint, that the plaintiff seeks a decree for specific performance by the United States of alleged obligations under a contract, whereof the court is without jurisdiction.

It appears by the bill of complaint that the plaintiff has plain, adequate, and complete remedies at law, if he have any right.

Fourth, by the true and lawful construction and meaning of the contract sued upon, the defendant, in his official capacity, has the right and power to discontinue the use of the plaintiff's equipment in the manner alleged.

That by the true construction of the said contract the United States has an option to discontinue the use of the plaintiff's equipment in the manner alleged.

This motion was heard, and on March 31, 1915, was sustained and the bill dismissed.

*Mr. Daniel Thew Wright* and *Mr. T. Morris Wampler* for the appellant.

*Mr. John E. Laskey,* United States District Attorney, and *Mr. James B. Archer,* Assistant, for the appellee.

Mr. Chief Justice Shepard delivered the opinion of the Court:

It will be observed that the third article of the contract provides that any and all of the equipments contracted for may be discontinued upon ninety days' notice, which was given by the First Assistant Postmaster General, whose acts, by sec. 18, in respect to this contract, shall be taken to be the acts of the Postmaster General.

The letter of the Assistant Postmaster General of November 14, 1914, notified the plaintiff that the use of his equipments would be discontinued on January 31, 1915, and that his contract would be canceled, effective on that date.

Reconsideration of this was refused, and the former notice adhered to.

The Assistant Postmaster General had the right to discontinue the use of the equipments by giving ninety days' notice. All that the plaintiff was to furnish under the contract was these equipments; this was what he was paid for.

The court have not agreed that under the contract the stoppage of these equipments, under clause three (3) of the contract, was essentially the termination of plaintiff's service, and consequently of his contract.

In the opinion of the writer this was necessarily so, and that notice that the contract would be canceled added nothing to this effect.

However this may be, any suit for breach of a contract or for its specific performance would be a suit against the United States. Their interests only are involved. Congress had appropriated the money and authorized the Postmaster General to inaugurate the special service provided for in the appropriation act of 1914, and he had made preparations for the new service in lieu of plaintiff's. The bill for injunction against him to prevent putting into effect the new service would act as a negative specific performance by preventing the Postmaster General from substituting the new service, and would affect only

the interests of the United States. No action for specific performance would lie against the United States.

The form of the suit for injunction is a negative specific performance, which would compel the United States to accept the performance of a contract, and thereby affect their interest.

The First Assistant Postmaster General is sued officially, as such, and his restraint from terminating the contract is the restraint of the United States, whose official he is.

Notwithstanding the serious character of the injuries that would be inflicted upon plaintiff by cessation of the contract, the only remedy that he will have therefor is in the court of claims, where alone the United States permit themselves to be sued.

The case is wholly unlike that of *Noble* v. *Union River Logging R. Co.* 147 U. S. 165, 37 L. ed. 123, 13 Sup. Ct. Rep. 271. In that case a property right had become vested in the plaintiff by the action of the Secretary of the Interior in accordance with law. As decided, this was a vested right which no succeeding Secretary had the right to set aside. It was his personal act, and involved an invasion of right over which he had no jurisdiction.

The defendant is not interfering in this contract in his individual capacity, but solely as an officer of the United States; he has no personal interest in the matter.

It appearing that Congress had made an appropriation for experimental service in Washington, which might conflict with that in plaintiff's contract, the First Assistant Postmaster General notified him of the discontinuance of his equipment. This he had a right to do under the contract. It was within his discretion.

The fact that he accompanied it also with notice that the contract be canceled is immaterial, for the reason that the discontinuance of the equipment, which was the sole service to be performed by the plaintiff, was itself a termination of the contract.

If, however, he exceeded his power in the latter respect, the question is one in which the United States only are interested;

and if plaintiff has been aggrieved he would have such remedy as the law provides by an action in the Court of Claims, where alone the United States can be sued.

The court was right in dismissing the bill, and its decree is affirmed, with costs.                                    *Affirmed.*

A motion by the appellant for a rehearing was overruled January 22, 1916, and an appeal by him to the Supreme Court of the United States allowed February 5, 1916.